**C. W. SCHMID d/b/a C. W. Schmid Plumbing & Heating**

v.

**The UNITED STATES.**

No. 75-63.

United States Court of Claims.
Oct. 15, 1965.

Eldon H. Crowell, Washington, D. C., attorney of record, for plaintiff. Gilbert A. Cuneo, David V. Anthony, Sellers, Conner & Cuneo, Washington, D. C., J. C. Garlington and Garlington, Lohn & Robinson, Missoula, Mont., of counsel.

William L. Davis, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, and COLLINS, Judges.

COWEN, Chief Judge.

On March 15, 1957, plaintiff was awarded a construction contract for an addition to the central heating plant at Minot Air Force Base, Minot, North Dakota. A major item of the work, and the item over which this present controversy centers, was the furnishing and installation of two high temperature hot water boilers. These specifications for the boilers provided that they could be the product of any qualified manufacturer, provided they met certain stated capacity and performance requirements. Existing boilers in the heating plant were manufactured by International Boiler Works Company (hereinafter referred to as International).

The invitation for bids required bidders to submit data on the boilers proposed to be furnished, including the name of the boiler manufacturer and various dimensions, capacities, and sizes. Plaintiff initially submitted a bid accompanied by a data sheet naming and describing the product of International. Before bids were opened, plaintiff telegraphed a reduction of $34,000 in his bid price. Plaintiff says that his initial bid price was based on a quotation received from International, while the reduction was based upon a subsequent lower quotation from Combustion Engineering, Inc. (hereinafter referred to as Combustion). Another bidder for the job offered International boilers, while a third bidder proposed to install either International or Combustion boilers. The equipment of both manufacturers complied in all particulars with the requirements of the specifications.

The award to plaintiff was based on the price as revised by the telegraphic modification. Shortly thereafter, plaintiff signed a firm contract with Combustion to furnish the boilers in question. On May 17, 1957, the defendant's Architect-Engineer rejected the shop drawings on the Combustion boilers on the ground that they did not conform to the equipment that had been described in the bid data sheets.

Plaintiff protested the rejection in a telegram dated May 23, 1957. He was informed on May 27 thereafter that equipment which did not conform to specifications and data sheets submitted with the bid would be rejected. He was also advised of his appeal rights and told that, pending final decision of the dispute, he was obligated to proceed diligently with the performance of the contract in accordance with the contracting officer's decision. The written decision

and findings of fact of the contracting officer were issued on June 26, 1957.

After the award of the contract and before the dispute over the boilers arose, plaintiff had begun construction of the concrete foundations for the Combustion boilers. Because of the differences in dimensions, the International boilers would not fit these foundations. On July 2, 1957, the contracting officer pointed out this fact to plaintiff and stated that:

You are hereby directed to cease all construction on the boiler foundation until you have obtained approved shop drawings. You are also directed to submit shop drawings to the Architect-Engineer covering the correct boiler installation.

Your delay in submitting corrected shop drawings will seriously affect your ability to complete the work within the time specified. Unless satisfactory evidence is received by this office on or before 12 July 1957 that you have submitted proper shop drawings and have taken measures for removal of the improper foundations, such failure will, in accordance with Clause 5 of your contract, be considered lack of prosecution of the work with such diligence as will insure its completion within the time specified and will be the basis of a recommendation that your right to proceed with work under the contract be terminated.

Plaintiff stopped work on the boiler foundations, but he did not remove them. He then requested shop drawings from International which refused to supply them until it received a firm order. Plaintiff refused to place the order, since he felt that he had a right to install Combustion boilers. Therefore, he did not submit at any time shop drawings on the International boilers. The directive of the contracting officer was repeated several times, with matters remaining in status quo.

On July 11, 1957, the plaintiff appealed the June 26 decision of the contracting officer. At a meeting convened on Au-

gust 22, 1957, to discuss whether plaintiff's contract should be terminated for default, the contracting officer announced that plaintiff's appeal had been sustained by the Chief of Engineers and that plaintiff would be permitted to install Combustion boilers. Both the Chief of Engineers and the Comptroller General, to whom the question was referred, decided that the contracting officer had erred in requiring the International equipment, since both boilers complied with the specifications.

Subsequently, the shop drawings covering Combustion boilers were resubmitted and promptly approved. The contract was completed within the date fixed for completion, as extended pursuant to modifications not pertinent to this case.

Plaintiff claims that shortly after he took his appeal, the boilers which had been reserved for him on Combustion's fabrication schedule were assigned to another purchaser because of plaintiff's inability to submit approved shop drawings. Plaintiff also asserts that as a consequence of the delay between the original submission of the drawings and their subsequent approval, the shipping date for the boilers was revised from July 1, 1957 to November 1, 1957, thus forcing the installation work into the winter months.

After installing the Combustion equipment, plaintiff submitted a claim for increased costs occasioned by the contracting officer's rejection of the Combustion boilers and his order stopping work on the Combustion foundations. The contracting officer, the Corps of Engineers Board of Contract Appeals, and the Armed Services Board of Contract Appeals each rejected plaintiff's claims, the latter by decision dated August 3, 1962.

In the administrative proceedings the parties stipulated that if plaintiff had proceeded to install International equipment during the period the appeal was pending, plaintiff's costs, in terms of cancellation charges, the price differential between the two makes of boilers, the cost of taking out and rebuilding the Combustion foundations, and other

charges, would have exceeded the $60,000 now claimed and that the costs of compliance, if incurred, would have seriously jeopardized the contractor's solvency. After plaintiff's claim for increased costs had been denied by the contracting officer and the Corps of Engineers Board of Contract Appeals, the case was submitted to the ASBCA solely on the issue of whether the stipulated facts constituted a basis upon which relief could be granted under the Suspension of Work clause of the contract. The Board found that the contracting officer erroneously interpreted the contract to require the use of International boilers. As for the claimed suspension of work, the Board concluded that the work stoppage resulted from the plaintiff's refusal to comply with the contracting officer's directives pending appeal, rather than from any order issued by the contracting officer to suspend the work completely. The Board accepted the government's contention that the Suspension of Work clause affords no recovery for delay damages caused by the contractor's failure to proceed in accordance with the contracting officer's decision pending appeal, because it held that, under such circumstances, the contracting officer was not under a duty to issue a Suspension of Work order.

Applying the rationale of Rice v. United States, 317 U.S. 61, 63 S.Ct. 120, 87 L.Ed. 53 (1942), the Board decided that the contracting officer's misinterpretation of the specifications constituted a change under the Changes article of the contract. The Board noted that the change was not in fact carried out and that the order was subsequently revoked. However, the Board concluded:

> This does not alter the fact that the contracting officer's decision was, at the time it was issued, a change order which made operative the provisions of the "Changes" article while it was in effect.

The Board then remarked that "[i]f appellant had acted upon the decision and incurred costs, he would have been entitled to an equitable adjustment under the 'Changes' article." Since plaintiff did not comply with that portion of the Disputes article which states that "pending final decision of a dispute hereunder the contractor shall proceed diligently with the performance of the contract and in accordance with the contracting officer's decision," the Board considered that plaintiff was barred from any recovery, either under the Changes clause or the Suspension of Work article.

■ For the reasons recently elaborated by this court in Jack Stone Company v. United States, No. 312–62, Ct.Cl., April 16, 1965, 344 F.2d 370, we concur with the decisions of the Chief of Engineers, the Comptroller General, and the ASBCA to the effect that the contracting officer's interpretation of the terms of the contract was clearly erroneous.

■ However, we cannot agree with the decision of the Armed Services Board of Contract Appeals in its interpretation of the Changes and Disputes clauses of the contract as applied to the facts of this case. The Board's determinations in this regard are legal decisions which are not binding on the court, 41 U.S.C. § 322, W. H. Edwards Engineering Corp. v. United States, 161 Ct.Cl. 322.

We recognize that in a number of decisions by the ASBCA and in several by this court, extra work performed by a contractor in compliance with an order of the contracting officer misinterpreting the contract has been treated as a constructive change under the Changes article and an equitable adjustment granted therefor, Jack Stone Company v. United States, supra; E. H. Sales, Inc. v. United States, No. 75–61, Ct.Cl., January 22, 1965, 340 F.2d 358 (1965). Those cases are clearly distinguishable, because in each the work had been performed by the contractor. In such instances, an equitable adjustment was allowed in order to prevent an injustice and to avoid unjust enrichment to the government. No change as to the boilers used on the contract involved here was made. After the reversal of the contracting officer's erroneous order, the situation reverted to the status which prevailed before the order was issued, and the con-

tractor was permitted to install the equipment he had intended to use from the beginning.

▇▇▇▇ The covenant in the Disputes clause, which requires the contractor to proceed with the work pursuant to the contracting officer's orders pending an administrative appeal, is a provision inserted in the contract for the benefit of the government. The purpose of the covenant is to prevent an interruption of the work and a consequent loss or detriment to the government while the administrative proceedings are in progress. There are instances when time rather than ultimate cost is of the essence and progress the goal rather than economy. If the contracting officer had decided that time was the primary consideration, he might have terminated plaintiff's contract and, had he done so, a much different issue would have been presented to us. Apparently, however, because of the much greater cost that compliance with his order would have entailed, he elected not to terminate the contract. As a consequence, the government has saved a not inconsequential sum of money because the contractor's position as to the requirements of the contract was correct. The contract was finished on schedule, as extended for reasons not related to the present controversy, but at a greater cost to plaintiff. Plaintiff proceeded diligently with other phases of the work until the contracting officer's order was reversed. Defendant suffered no damage as a result of plaintiff's action; on the contrary, it received a substantial benefit. In the face of these facts, we think it would be anomalous and a miscarriage of justice to declare that the contractor would have been entitled to an equitable adjustment had he followed the erroneous order and thereby increased the government's cost, but to hold he may not recover the costs that resulted from an admittedly correct position, which provided a substantial saving to the government. The provision in the disputes clause about proceeding with the work should not be interpreted to prevent recovery in a case such as this where the government was wholly benefited by the contractor's failure to proceed with the work.

The rule enunciated in Rice v. United States, 317 U.S. 61, 63 S.Ct. 120, is not applicable here. In that case, a formal change order was issued and the contractor was given a time extension and a price increase for delay and extra costs made necessary by changed conditions encountered. Under those circumstances, the court held that consequential damages, including delays to and the increased cost of unchanged work, were not recoverable because of the language contained in the Changes and Changed Conditions articles of the contract. The Supreme Court did not, in any way, undertake to deal with the legal effect of a contracting officer's misinterpretation of a contract. As we have indicated in previous decisions, the Rice doctrine is not applicable in factual situations analogous to those in this case, Laburnum Construction Corporation v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963); George A. Fuller Company v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70; J. A. Ross & Company v. United States, 115 F.Supp. 187, 126 Ct.Cl. 323.

The case is before us on motions for summary judgment, which are based on the administrative record. It will be necessary to return the case to the trial commissioner for a determination of the extent to which the plaintiff's work was delayed as a result of the government's action and the costs incurred by plaintiff as a direct consequence thereof. For the purpose of deciding the issues relating to the right of plaintiff to recover, we have accepted the statement in plaintiff's motion that the delay in approving the shop drawings for the Combustion boilers deferred the shipping date of the boilers to November 1, 1957, and thereby compelled plaintiff to install the boilers at greater cost during the winter. In the proceedings before the commissioner, it will be incumbent on plaintiff to establish these facts. If plaintiff does so, he would be entitled to recover the resulting increased costs for, as we stated in J. H.

Hedin Construction Co. v. United States, No. 387–56, Ct.Cl., June 11, 1965, 347 F. 2d 235, "where government-caused delays force the contractor into more costly operations, the government will have to respond in damages for [resulting] the additional outlays." This rule applies despite the fact that the contract was completed within the scheduled time as extended. Metropolitan Paving Company v. United States, 163 Ct.Cl. 420, 325 F.2d 241 (1963).

Plaintiff's motion for partial summary judgment is granted; defendant's motion for summary judgment is denied, and the case is remanded to the trial commissioner for further proceedings in accordance with this opinion.